

**SIGNED THIS 14th day of October, 2020**

**THIS MEMORANDUM OPINION HAS BEEN ENTERED ON THE DOCKET. PLEASE SEE DOCKET FOR ENTRY DATE.**

Paul M. Black
UNITED STATES BANKRUPTCY JUDGE

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JEFFREY BERNHARD WETTER | ) | CHAPTER 7 |
| | ) | |
| Debtor. | ) | CASE NO. 19-71010 |

## MEMORANDUM OPINION

This matter comes before the Court on a Motion to Convert Case to Chapter 11 (the "Motion") filed on July 23, 2020 by the Debtor, Jeffrey Bernhard Wetter (the "Debtor" or "Dr. Wetter"). The Debtor asks this Court to convert his Chapter 7 case to one under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et. seq.*, such that the Debtor can then amend his petition to avail himself of the relatively new Subchapter V provisions applicable to Small Business Debtors. The Chapter 7 Trustee, Steven L. Higgs (the "Trustee"), filed an objection, joined in by Aesthetic Dentistry of Charlottesville, P.C. ("ADC") and Pacific Western Bank. On August 17 and 20, 2020, the Court conducted evidentiary hearings on the Motion and the objections thereto.

1

The parties filed briefs and responses and the matter is now ready for decision. For the following reasons, the Motion will be denied.[1]

## FINDINGS OF FACT

The parties to this case have a long history, both in this Court and elsewhere. The Debtor filed a voluntary Chapter 7 petition in this Court on July 31, 2019. ECF 1. The Debtor is a dentist practicing in the Commonwealth of Virginia. While the Debtor is married, he filed this case individually. His husband, Scott Sayre, is not currently employed. The Debtor's initial Schedule I reflects he works at ES Healthcare, which provides dental services to Virginia correctional institutions, generating a net take-home pay of $4,254.34 a month. After expenses, his net monthly income was shown as $154.34 per month. ECF 1, pp. 31-34.

Before taking his current employment, the Debtor sold his private practice and briefly ceased the active practice of dentistry. During the period he was not actively practicing, his main source of income was approximately $30,000 in monthly payments he received from ADC, his former practice.[2] ADC began experiencing financial problems in 2018. In July 2018, ADC stopped making its monthly payments to the Debtor. In November 2018, ADC filed for Chapter 11 relief in the Harrisonburg division of this Court.[3] That case is pending before Chief Judge Rebecca B. Connelly.[4] Thereafter, the Debtor became personally liable on several ADC loans

---

[1] The Court is aware the issues presented arise in an unusual procedural posture. The Debtor has not actually filed an amended petition to elect Subchapter V status. He must convert to Chapter 11 to do that. One cannot elect Subchapter V of Chapter 11 while in Chapter 7. However, his motion to convert states that "[the] Debtor, by counsel, pursuant to 11 U.S.C. § 706(a) moves to convert this case to a Chapter 11, so it can process as a Subchapter V Small Business Debtor Reorganization." ECF 58. That statement generated the vehement opposition to the motion to convert that led to a two-day trial. As is explained in this Opinion, the parties to this case have locked horns repeatedly in other courts, and they are more than familiar with each other's positions. As the issues are on the table, the Court will address them now.

[2] Nearly $20,000 a month for sale of the business and $9,500 in rent for the Charlottesville office.

[3] *See In re Aesthetic Dentistry of Charlottesville, P.C.*, No. 18-62306.

[4] The docket reflects ADC engaged in litigation against Dr. Wetter in that case. The same attorney for ADC represents the Trustee in this case. The Statement of Financial Affairs ("SOFA") in this case reflects Dr. Wetter has also sued ADC on a note in state court in Albemarle County, Virginia. ECF 1, p.38.

that he had guaranteed. These include an unsecured loan of approximately $490,000 to Capital Source Bank (also known as Pacific Western) and $35,000 in unsecured credit card debt owed Bank of America.

Along with his petition in this case, the Debtor filed a complete set of bankruptcy schedules (the "Original Schedules"). The Original Schedules reported total assets of $3,997,078.50 but indicated this was a no-asset case. ECF 1, p.17. Primarily, this was due to claimed exemptions, though some of the scheduled assets of substance appear to have little actual value.[5] The crux of the present controversy involves the Debtor's claimed exemption of his membership interest in JBW Investments, LLC ("JBW") owned as tenants by the entirety.

Valued in its entirety at approximately $1,850,000.00 by the Debtor, with his portion valued at $924,875.00, JBW is a limited liability company holding real property. In total, JBW owns four properties: (1) the Debtor's residence at Smith Mountain Lake in Franklin County, Virginia; (2) a dental office in Bridgewater, Virginia; (3) a dental office in Charlottesville, Virginia; and (4) a condominium in St. Thomas, U.S. Virgin Islands. JBW has substantial equity in the first three properties and the condominium is completely debt-free. Neither the Debtor nor his spouse pay any rent to JBW for use of the residence.

The evidence at trial reflects that in the Original Schedules in this case, the Debtor stated that he transferred his 100% membership interest in JBW to him and his spouse as tenants by the entirety (the "TBE Transfer") on January 1, 2018. ECF 1, p.40. The evidence further reflects that at the first meeting of creditors, the Debtor confirmed that the date of the TBE Transfer was

---

[5] The Debtor scheduled a claim of $1,039,706.00 against Anita Stewart in connection with an unpaid buy-in with ADC. Ms. Stewart filed Chapter 7 in Harrisonburg, Virginia and received her discharge. Likewise, the Debtor scheduled a claim against ADC for $614,000.00, but ADC is also in bankruptcy in Harrisonburg, and this claim appears to have limited, if any, value. The docket in that case reflects all three of Dr. Wetter's claims were disallowed.

3

January 1, 2018.  Tr. Ex. F.  Moreover, in response to a verification demand from the United States Trustee (the "UST"), the Debtor represented a third time that the date of the TBE Transfer was January 1, 2018.  Tr. Ex. C.  Debtor's counsel also provided the UST with a copy of the JBW Operating Agreement which purportedly was signed by Debtor and his spouse on January 1, 2018 as tenants by the entirety.  *Id*.

Given the substantial value of the JBW asset, the Trustee remained wary of the purported exemption.  Moreover, Section 727(a)(2) provides, in pertinent part, that the Court shall not grant the debtor a discharge if the debtor, "... with intent to hinder, delay or defraud a creditor …has transferred …(A) property of the debtor, within one year before the date of the filing of the petition."  11 U.S.C. § 727(a)(2).  In advance of the continued meeting of creditors scheduled for September 24, 2019, the Trustee requested the Debtor provide organizational and meeting documents for JBW.  Debtor's counsel emailed the Trustee an assignment of the JBW interests, identical in form, but dated September 25, 2018.  Tr. Ex. D.  This later date was well within the one-year period set by Section 727(a)(2)(A).  The January 1, 2018 date was not.

At the continued meeting of creditors, the Trustee quizzed the Debtor regarding the discrepancy.  The Debtor explained that he had actually signed the assignment on September 25, 2018, but his estate planning lawyer, James B. Massey, III, had told him to "backdate the transfer" to January.[6]  The UST was not present at the meeting of creditors and was not subsequently informed of the backdated TBE Transfer.

The September meeting of creditors was continued until October 2019 and then several more times because the Debtor needed to provide certain additional information and

---

[6] At the August 17, 2020 trial, the Debtor testified that it was not Mr. Massey but rather his long-time accountant who advised him to backdate the TBE Transfer.

documentation to the Trustee. The meeting of creditors concluded on April 23, 2020. During this time, the Debtor did not correct or clarify his representations and statements to the UST. The UST still believed the TBE Transfer date to be January 1, 2018.

The Court granted the Debtor's discharge on March 4, 2020. ECF 20. However, on May 22, 2020, the Trustee filed an Adversary Proceeding (A.P. No. 20-07025) alleging the Debtor's TBE Transfer was a fraudulent conveyance made with the intent to hinder, delay, and defraud his creditors and recoverable under 11 U.S.C. §§ 544, 548, and applicable Virginia state law. This prompted the UST to contact the Trustee. They discovered that they both emailed the Debtor in September 2019 requesting verification of the TBE Transfer but received different answers. The Trustee was sent a TBE Transfer Assignment dated September 25, 2018. Tr. Ex. D. The UST was sent a TBE Transfer Assignment dated January 1, 2018. Tr. Ex. C. While the Debtor informed the Trustee at the meeting of creditors that he backdated the TBE Transfer, he never so apprised the UST. The Debtor was clearly in financial distress as of the September 2018 date, lending support to various fraudulent and/or voluntary conveyance theories.[7]

Shortly thereafter, the UST filed an Adversary Proceeding (A.P. No. 20-07026) seeking to revoke the Debtor's discharge. On July 14, 2020, in his Answer to the UST's Complaint, the Debtor admitted for the first time – nearly one year after filing – that at all times he knew the TBE Transfer occurred on September 25, 2018.[8]

Shortly after the Debtor's admissions to the UST, another twist occurred. The Debtor filed Amended Schedules on July 28, 2020. ECF 60. The Amended Schedules show the Debtor

---

[7] ADC was not making payments to the Debtor in the summer of 2018, and another tenant bounced a rent check. The Debtor was not practicing dentistry, either. The Debtor also had substantial personal liability on debt for ADC he had guaranteed. Because the Debtor paid no rent to JBW for his residence, the JBW income shouldered the carrying costs for all properties titled in the LLC name, including the mortgages.

[8] *See Fitzgerald, III v. Wetter,* ECF 6.

5

owning only a 50% membership interest in JBW held through a revocable trust. The Debtor explained that in September 2016, approximately three years before his Petition was filed, he actually transferred his 100% interest in JBW in a different manner. He conveyed 50% into a revocable trust for himself and 50% to Mr. Sayre, who in turn conveyed his interest into his own revocable trust. While the Debtor knew he had signed the Assignment in September 2016, he could not find the documents, and assuming them lost and ineffective, proceeded with the TBE Transfer in 2018 as though he owned 100% of the membership interest in JBW. It does not appear the Debtor told anyone, including the Trustee or the UST, about the missing 2016 assignments until he "found" them.[9]

At trial, the Debtor explained that on July 19, 2020 he found the September 2016 Assignments in a gun safe inside his home along with other estate planning documents, including original wills and trusts, prepared by Mr. Massey for both the Debtor and Mr. Sayre. The estate planning documents were signed and witnessed in Mr. Massey's office. However, Mr. Massey's September 8, 2016 transmittal letter explained that while the original signed estate planning documents were enclosed, the LLC membership assignments needed to be executed. Specifically, Mr. Massey stated as follows:

> I also enclose six documents you may wish to use for JBW Investments LLC. Two are documents whereby Jeff transfers X% of his membership interests to Scott. The others are documents whereby each of you transfers your share of JBW into your respective revocable trusts and, as Trustee, agrees to be bound by the company's operating agreement. The percentages need to be filled in if and when you do this.

Debtor's Ex. 2. ECF 66. The signed Assignment documents found in the gun safe are each dated September 12, 2016. Debtor's Ex. 4-6. ECF 66.

---

[9] The Debtor represented to Union Bank & Trust (2017) and First Citizens Bank (2019) that he was the 100% owner of JBW. The latter representation was in a Personal Financial Statement that was signed and verified. These representations were made after the Debtor transferred 50% of JBW to his spouse. Trustee Ex. U, V. ECF 68.

Thus, after the September 2016 Assignments, it appears the Debtor owned a 50% membership interest in JBW through his revocable trust.  The 50% interest is valued at $924,875.00 on the Amended Schedules.  The day after finding these signed documents, the Debtor filed a motion to convert.[10]  The Trustee filed an Objection to the Motion.  ECF 63.  The Debtor's two largest creditors, ADC and Pacific Western, representing 94% of the unsecured debt, joined in the Trustee's objection.  ECF 65, 67.  There is no evidence at this time that the Debtor was in financial distress in 2016 when the transfers were made.

While the Court found the Debtor to be overly smug and less than credible at trial, the Court did find more credible the testimony of the Debtor's spouse, Mr. Sayre, that they signed the 2016 transfer documents when they said they did – in September 2016.[11]  It appears possible they were in fact signed shortly after Mr. Massey mailed the documents to them and then put in the gun safe with the estate planning documents.[12]  If all this is true, it means that as of the 2016 transfer date, the Debtor owned 50% of JBW through a revocable trust, and that Mr. Sayre owned the other half.  The attempted transfer of the 100% interest in JBW from the Debtor (not from the revocable trust) to the Debtor and his husband as tenants by the entirety in 2018 would be a nullity.  One cannot transfer what one does not own.  This would also mean that the Debtor's interest in the revocable trust, valued by the Debtor at $924,875.00, is now part of the estate in this Chapter 7 case.[13]

---

[10]  Counsel for the Debtor initially filed the motion to convert on July 20, 2020, but then marked that document as entered in error and re-filed the motion to convert on July 22, 2020.  That motion to convert was also marked as entered in error and then the instant Motion to Convert was filed on July 23, 2020.

[11] It does not appear that Mr. Sayre has yet been deposed in the adversary litigation.  The Court makes no binding findings as to the *bona fides* of the 2016 assignment at this stage of the proceedings.

[12] The Debtor was confident he signed the assignments in 2016 and he knew he needed them, but assumed they were lost. Why he did not look for his estate planning documents, which he knew were done by the same attorney at the very same time the 2016 assignments were prepared, seemed to be an obvious question not persuasively answered.

[13] An interest in a revocable living trust constitutes property of the estate under 11 U.S.C. § 541.  *In re DelFosse*, 442 B.R. 481, 485 (Bankr. W.D. Va. 2010); *In re Arnold,* 369 B.R. 266 (Bankr. W.D. Va. 2007).

The Debtor asserts he should be allowed to convert this case to one under Chapter 11 so that he can elect Subchapter V status.  A non-consensual plan, which this would appear to be headed for, would allow him to pay his projected disposable income or property of an equivalent value over a three to five year period into the plan.[14]  At trial, the evidence before the Court showed this was about $154.34 per month, although the Debtor indicated he expected his income to increase to provide up to $2,000.00 per month in disposable income plan contributions.  So, the question before the Court now is should this Debtor be allowed to convert to Chapter 11, and if so, elect Subchapter V treatment?  Or, when lack of good faith abounds at the time of the requested conversion, including overt misrepresentations and concealment of pre-petition transfers, should the Debtor be denied the ability to convert?[15]  Does the Court even need to get that far?

## CONCLUSIONS OF LAW

This Court has jurisdiction of this matter by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a) and the referral made to this Court by Order from the District Court on December 6, 1994 and Rule 3 of the Local Rules of the United States District Court for the Western District of Virginia.  This Court further concludes that this matter is a "core" bankruptcy proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (O).

### I.  11 U.S.C. § 706(a): *Marrama* and Conversion to Chapter 11

11 U.S.C. § 706(a) provides "[t]he debtor may convert a case under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under

---

[14] 11 U.S.C. § 1191(b) and (c).  In Chapter 11, the Debtor must still meet the best interests of creditors test under 11 U.S.C. § 1129(a)(7) to achieve confirmation, no matter which form of Chapter 11 he might pursue.
[15] The Debtor has not indicated an interest to pursue Chapter 11 outside the election of Subchapter V.

section 1112, 1208, or 1307 of this title. Any waiver of the right to convert a case under this subsection is unenforceable." The right to convert a case, however, is not absolute. In *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365 (2007), the Supreme Court observed that, in effect, a debtor should not be able to convert his case when conversion would result in immediate dismissal or reconversion. Giving the example of a debtor who fraudulently conceals assets prior to or during bankruptcy, the Supreme Court observed that a debtor who acts in bad faith may forfeit his right to relief under the Bankruptcy Code. *Id*. at 367.[16]

*Marrama* dealt with a requested conversion from Chapter 7 to Chapter 13 – not a conversion to Chapter 11. Nevertheless, this Court agrees with *In re Hunter*, 597 B.R. 287 (Bankr. M.D.N.C. 2019), that *Marrama* is also applicable where the debtor seeks to convert to Chapter 11, because 11 U.S.C. § 1112(b) serves a similar purpose to that of 11 U.S.C. § 1307(c). Other courts have come to the same conclusion. *See In re Woodruff*, 580 B.R. 291, 296 (Bankr. M.D. Ga. 2018); *In re FMO Assocs. II*, *LLC*, 402 B.R. 546, 551 (Bankr. E.D.N.Y. 2009); *In re Broad Creek Edgewater*, *LP*, 371 B.R. 752, 758 (Bankr. D.S.C. 2007).

In *Marrama*, the Supreme Court based its decision on the language of Section 706(a) but read it together with Section 706(d) of the Bankruptcy Code, which limits the right to convert to a chapter under which the debtor qualifies to be a debtor. As a result, the debtor in *Marrama* had to meet the eligibility requirements of a Chapter 13 debtor under Section 109(e). Here, however,

---

[16] "Nothing in the text of § 706 or § 1307(c) (or the legislative history of either provision) limits the authority of the court to take appropriate action in response to fraudulent conduct by the atypical litigant who has demonstrated that he is not entitled to the relief available to the typical debtor." *In re Criscuolo*, No. 09-14063-BFK, 2014 WL 1910078, at *3–4 (Bankr. E.D. Va. May 13, 2014)(quoting *Marrama,* 549 U.S. at 374–75). *Marrama* "also pointed out that the debtor did not have an absolute right to conversion, since he would not have qualified to file bankruptcy under Chapter 13." *Criscuolo,* at *4, n.4 (citing *Marrama*, at 372-73).

the Debtor must qualify under Chapter 11 of the Bankruptcy Code. Both Chapter 13 and Chapter 11 debtors are subject to having their cases dismissed for "cause," and bad faith can be a basis for a dismissal for "cause" under both chapters. The Supreme Court's analysis can be persuasively applied to a request to convert to Chapter 11.

Notably, the fact that conversion under Section 706(a) requires a debtor to file a motion and give notice pursuant to Fed. R. Bankr. P. 1017(f)(2) suggests that the court's role in such a motion "is more than a meaningless one." *FMO Assocs., II, LLC*, 402 B.R. at 549 (quoting *In re Krishnaya*, 263 B.R. 63, 66 (Bankr. S.D.N.Y. 2001)). A potentially vexing question is to what extent *Marrama* should be read in in conjunction with *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989), the controlling law in the Fourth Circuit on dismissal of a Chapter 11 case for cause. The Trustee contends that *Marrama* abrogates, if not informs, *Carolin*. The Debtor contends that the *Carolin* test must still be met, and that subjective bad faith and objective futility must be shown. The Court need not answer that question, because there are alternative grounds to deny the request for conversion.

As the UST correctly points out, the evidence at trial established that the Debtor is a small business debtor. The Debtor's schedules list claims totaling $2,536,505.32 and his testimony during the hearing demonstrates that not less than 50% of his debts arose from commercial or business activities of the Debtor. *See* 11 U.S.C. § 101(51D). As a result, if the Debtor did convert to Chapter 11, but did not elect to proceed under Subchapter V, his case would be a "small business case" as defined in the Bankruptcy Code. [17] Upon doing so, the Debtor would immediately be in default of 11 U.S.C. § 1121(e)(2), which provides that in a

---

[17] "The term 'small business case' means a case filed under chapter 11 of this title in which the debtor is a small business debtor and has not elected that subchapter V of chapter 11 of this title shall apply." 11 U.S.C. § 101(51C).

10

small business case, "the plan and a disclosure statement (if any) shall be filed not later than 300 days after the date of the order for relief." 11 U.S.C. § 1121(e)(2).[18] The foregoing deadline can only be extended if the order extending time is entered before the existing deadline has expired and other conditions are met. 11 U.S.C. § 1121(3)(A)-(C). That deadline has come and gone. The petition in this case was filed July 31, 2019, which is when the order for relief was entered. The 300th day after the date of the order for relief was May 26, 2020.[19]

Why does this matter? Because 11 U.S.C. § 1112(b)(4)(J) includes as grounds for conversion or dismissal "failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court." Upon conversion, the Debtor immediately will be in default of a non-Subchapter V small business case, which the evidence establishes this case clearly would be. Furthermore, Section 706(d) comes into play, "[n]otwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter." 11 U.S.C. § 706(d). In line with *Marrama*, conversion should not be permitted where grounds for conversion or dismissal would be triggered immediately. Thus, the Debtor is not eligible for relief in Chapter 11 as a small business debtor unless he elects Subchapter V status. Section 1121 of the Bankruptcy Code does not apply in Subchapter V. 11 U.S.C. § 1181(a). However, Subchapter V does not provide the

---

[18] "Congress intended that bankruptcy courts be more active in 'judicial oversight of small business bankruptcy cases, which often are the least likely to reorganize successfully.' H. Comm. on the Judiciary, Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, H. Rep. No. 109–31, pt. 1, at 92 (2005), 144 U.S. Code Cong. & Admin.News 2005, p. 88." *In re Darby Gen. Contracting, Inc.*, 410 B.R. 136, 143–44 (Bankr. E.D.N.Y. 2009).
[19] Sections 1121(e)(2) and (3) are an example of Congress knowing how and when to set a hard deadline, and under what limited circumstances they can be extended and when.

11

debtor a safety valve, as the Debtor cannot convert to elect Subchapter V status in the circumstances of this case.[20]

## II. Subchapter V

The Small Business Reorganization Act of 2019 ("SBRA") came into effect on February 19, 2020. The SBRA added a new "Subchapter V" to Chapter 11 of the Bankruptcy Code, codified in 11 U.S.C. §§ 1181-1195. "Subchapter V by its very nature is intended to be an expedited process. It provides qualifying debtors with some powerful and cost-saving restructuring tools not otherwise available to Chapter 11 debtors." *In re Seven Stars on the Hudson Corp.,* 618 B.R. 333, 346 (Bankr. S.D. Fla. 2020).[21]

Subchapter V is intended to be a simplified process as well. To this end, Subchapter V establishes certain deadlines applicable to a Subchapter V case. For example, Subchapter V requires a court to hold a status conference not later than 60 days after the order for relief,[22] and that the debtor file a plan not later than 90 days after the order for relief.[23] These deadlines run from the date of the order for relief in the bankruptcy case. Neither Subchapter V nor Section 348(b) of the Bankruptcy Code specifically adjust these deadlines when a case is converted to Chapter 11 from another chapter.

The Court entered this Debtor's order for relief on July 31, 2019. Three hundred and fifty-five days later, on July 20, 2020, the Debtor filed a motion to convert. The Trustee contends the Debtor, upon amending his petition to elect to proceed under Subchapter V, immediately runs afoul of the 11 U.S.C. § 1188(a) and 1189(b) deadlines. To correct this, the

---

[20] If a small business debtor fails to make the small business debtor designation and the Court later rules that the debtor is a small business debtor, the small business deadline runs from the date of the petition not the date of the court's determination. Bankruptcy Rule 1020 provides a mechanism to challenge any improper designations.
[21] For a discussion of the many benefits of Subchapter V, see *Seven Stars*, 618 B.R. at 340.
[22] 11 U.S.C. § 1188(a).
[23] 11 U.S.C. § 1189(b).

Trustee contends the Debtor requires an extension to the statutory deadlines. If the Debtor cannot justify the need for an extension, he is not eligible to proceed under Subchapter V.

### A. 11 U.S.C. §§ 1188(a) and 1189(b)

First, the Court will dispense with the Section 1188(a) issue rather quickly. Section 1188 provides as follows:

> (a) In General.-Except as provided in subsection (b), not later than 60 days after the entry of the order for relief under this chapter, the court shall hold a status conference to further the expeditious and economical resolution of a case under this subchapter.
>
> (b) Exception.-The court may extend the period of time for holding a status conference under subsection (a) if the need for an extension is attributable to circumstances for which the debtor should not justly be held accountable.
>
> (c) Report.-Not later than 14 days before the date of the status conference under subsection (a), the debtor shall file with the court and serve on the trustee and all parties in interest a report that details the efforts the debtor has undertaken and will undertake to attain a consensual plan of reorganization.

11 U.S.C. § 1188. Notably, this statute imposes deadlines on the court in subsections (a) and (b), not on a debtor. Moreover, the deadline in subsection (c) is a deadline for a debtor that gets set only once the court sets the status conference. If the Court here has not set a status conference, how can the debtor have missed the deadline? That the Debtor has not yet met a deadline, when in this case the Court has not even set a status conference, is not a missed deadline for which the Debtor, specifically or in general, should be held accountable.[24]

Section 1189(b) is a different issue. That section provides as follows: "(b) Deadline.— The debtor shall file a plan not later than 90 days after the order for relief under this chapter, except that the court may extend the period if the need for the extension is attributable to

---

[24] Again, see footnote 1 as to the unusual posture of this case. The Court disagrees with both *Trepetin* and *Seven Stars,* discussed below, to the extent they view the status conference date as a potential stumbling block to a debtor delayed in electing Subchapter V.

13

circumstances for which the debtor should not justly be held accountable." 11 U.S.C. § 1189(b). Two recent cases have applied this statutory language differently to delayed Subchapter V elections. *Compare In re Trepetin*, 617 B.R. 841 (Bankr. D. Md. 2020), *with Seven Stars*, 618 B.R. at 346.

In *Trepetin,* the debtor sought to convert to Chapter 11 from Chapter 7. The debtor filed for Chapter 7 on February 10, 2020, roughly ten days before Subchapter V came into effect. After the case progressed uneventfully through Chapter 7, the debtor sought to convert to Chapter 11 and elect Subchapter V on June 11, 2020. *Trepetin*, 617 B.R. at 843-44. No one appears to have objected either to the conversion or to the election; however, the court addressed the debtor's request for an extension of the Section 1188 and 1189 deadlines.

*Trepetin* undertook a textual analysis of the words "justly" and "accountable" by reference to their dictionary definitions. The Oxford English Dictionary defines "justly" as "in accordance with…law or fairness" and "accountable" as "responsible." *Trepetin*, 617 B.R. at 849. *Trepetin* concluded that the question "thus becomes whether the Debtor is fairly responsible for his inability to timely submit his status report, attend the status conference, or file a plan." *Id.* The *Seven Stars* court looked to Chapter 12 of the Bankruptcy Code where the same phrase is found in Section 1221. *Seven Stars*, 618 B.R. at 344. There, courts have held the language to mean "the delay necessitating the extension was caused by 'circumstances beyond the debtor's control.'" *Id.* Thus, the courts pose two slightly different questions of the statute. Importantly to the Court here, *Trepetin* made the further observation that:

> [a]s a procedural matter, the Debtor appears to have done all he could to act timely in this Subchapter V case. He filed his requested extensions and Subchapter V election timely in connection with the conversion of his chapter 7 case to one under chapter 11. Similarly, since a chapter 7 debtor is not required or permitted to file a plan, the Debtor has not been dilatory in the plan process itself and appears to have complied with all his obligations under chapter 7 of the Code. *No party has alleged*

> *that the Debtor is acting in bad faith or engaging in wrongful or dilatory conduct in either his chapter 7 case or in the process of conversion.* As such, upon initial inquiry, the Debtor's need for an extension appears fairly attributable to factors outside of his control, namely the conversion process and requirements of chapter 7 versus chapter 11 of the Code.

*Trepetin*, 617 B.R. at 849 (emphasis added).

*Seven Stars* went in a different direction, with the court holding that if a debtor elects Subchapter V after expiration of the statutory deadlines, "the debtor should justly be held accountable for those circumstances, because the debtor created them." *Seven Stars*, 618 B.R. at 346. In *Seven Stars*' estimation, a debtor choosing to amend after the statutory deadlines expire is not *beyond* the debtor's control and therefore does not justify an extension. "Congress purposefully set a short deadline for a debtor to file a plan under Subchapter V, and set a very high standard for an extension of that deadline," the court explained. *Id.* at 345.

The Court believes *Seven Stars* to be too rigid in its application of Section 1189(b), and that *Trepetin* charts a better path. In fact, this Court has allowed Subchapter V cases to go forward when the Section 1189(b) deadline was missed by strict application where the debtor's petition was amended in an existing Chapter 11 case to make a delayed Subchapter V election. Why was the election delayed? Because Subchapter V did not exist when the case was filed.[25] One need only look at the Bankruptcy Rules to see how such a case might be allowed to go forward.

Bankruptcy Rule 1009(a) provides that "[a] voluntary petition, list, schedule, or statement may be amended by the debtor as a matter of course at any time before the case is closed." Fed. R. Bankr. P. 1009(a). Thus, no motion is required to elect Subchapter V status for a debtor

---

[25] For an excellent and scholarly presentation of the history of Subchapter V, see Judge Clarkson's opinion in *In re Progressive Sols., Inc.*, 615 B.R. 894 (Bankr. C.D. Cal. 2020) (extension of statutory deadline was permissible to allow debtor to amend chapter 11 petition to one under SBRA as the delay in filing was not attributed to the debtor).

already in Chapter 11. An amended petition is sufficient to make the election. Rule 1009 needs to be read in conjunction with Interim Bankruptcy Rule 1020, applicable to Subchapter V cases, which provides, in pertinent part, as follows:

> (a) Small Business Debtor Designation. In a voluntary chapter 11 case, the debtor shall state in the petition whether the debtor is a small business debtor, and if so, whether the debtor elects to have subchapter V of chapter 11 apply … The status of the case as a small business case or a case under subchapter V of chapter 11 shall be in accordance with the debtor's statement under this subdivision, unless and until the court enters an order finding that the debtor's statement is incorrect.
>
> (b) . . . [T]he United States trustee or a party in interest may file an objection to the debtor's statement under subdivision (a) no later than 30 days after the conclusion of the meeting of creditors held under §341(a) of the Code, or within 30 days after any amendment to the statement, whichever is later.
>
> (c) Procedure for Objection or Determination. Any objection or request for a determination under this rule shall be governed by Rule 9014 and served on: the debtor; the debtor's attorney; the United States trustee; the trustee; the creditors included on the list filed under Rule 1007(d) or, if a committee has been appointed under §1102(a)(3), the committee or its authorized agent and any other entity as the court directs.

Interim Fed. R. Bankr. P. 1020, as adopted by this Court in Standing Order No. 20-1. "Put simply, the original designation controls unless and until the court enters an order finding that a debtor's election is incorrect, and such 'review is triggered by an objection to the designation.'" *In re Moore Properties of Pers. Cty., LLC*, No. 20-80081, 2020 WL 995544, at *6 (Bankr. M.D.N.C. 2020)(citations omitted).

In this Court's experience thus far – the present case excluded – no one has objected to an election made under Subchapter V, even in Chapter 11 cases that were filed before Subchapter V came into effect. Why? Perhaps because the debtor bar is persuasive in making the case Subchapter V is less expensive and less cumbersome process to achieve confirmation given the inapplicability of the disclosure statement requirement and the absolute priority rule. Perhaps because the lending community sees Subchapter V as a more expeditious and less costly path

through Chapter 11.  Perhaps because of the involvement of the Subchapter V trustee as a disinterested intermediary able (in some instances seen already) to help broker a deal between parties previously at loggerheads.  Whatever the reason or reasons, there is a mechanism to object to an untimely or improperly made election.  If no such objection is made, the case can proceed as a Subchapter V case until the Court enters an order providing otherwise.  The Court sees no reason why a delayed conversion to Subchapter V cannot occur when the Section 1189(b) plan filing deadline can be adjusted by the Court to run from the new election, especially when no party in interest objects and the means and opportunity exist for one to do so.

But those are not the circumstances of this case.  The objection is raised here.  The Debtor has been evasive and misleading about the true nature of his involvement with JBW.  He has given conflicting information as to ownership and transfer dates at various times to the Trustee, the UST, and two different lenders.  Moreover, it is unfathomable to the Court why this Debtor was not more diligent in locating paperwork that is critical to the ownership and value of his largest asset.  He knew his estate planning attorney prepared documentation for the transfer of the LLC membership interests to his spouse and later to revocable trusts when the attorney prepared the couple's wills and trusts.  Simply looking for those estate planning documents at the beginning of this case would have eliminated much of the expensive litigation that has occurred to date.  The Debtor has played fast and loose with the facts, and under a "justly accountable" standard, he is not given the benefit of the doubt here.  If converted to Chapter 11 and Subchapter V elected, the Court would decline to extend the time for the Debtor to file a plan under Section 1189(b) given the Debtor's conduct based on the evidence adduced at trial.  Because the Debtor would immediately run afoul of Section 1112(b)(4)(J) if the Motion were granted and the election made, the Court will deny the Motion to Convert.

Moreover, without getting into an extensive *Carolin* analysis on dismissal, the Court observes it has serious concerns as to whether the Debtor could ever meet the best interests of creditors test in this case, which also bleeds into a good faith analysis, yet another component of confirmation in Chapter 11. The Trustee has raised that very issue. Under 11 U.S.C. § 1129(a)(7), a chapter 11 plan must provide that "[w]ith respect to each impaired class of claims or interests - (A) each holder of a claim or interest of such class - (i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date…." Section 1129(a)(7) applies in Subchapter V. *See* 11 U.S.C. § 1181(a)(specifying which provisions of Title 11 do not apply in Subchapter V).

Here, at the time of trial, the Debtor had $154.34 in monthly disposable income based on his schedules as filed. Nevertheless, based on whether he owned 50% or 100% of JBW, he was retaining an asset of a value of anywhere between $924,875.00 and $1,850,000.00. If fully exempt as tenants by the entirety property, he would exempt all of JBW and leave his creditors empty-handed, for the most part. Further, in evaluating the best interests of creditors test, a court may also account for a Chapter 7 trustee's avoiding powers. *In re Tenderloin Health*, 849 F.3d 1231, 1237 (9th Cir. 2017).[26] In this case, there is a legitimate question as to the recovery of a

---

[26] "Although '[t]he hypothetical liquidation analysis must be based on evidence and not assumptions in order to meet the best interests of creditors test,' Collier on Bankruptcy ¶ 1129.02 n.98 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2016) (citing *In re MCorp Fin., Inc.*, 137 B.R. 219, 228–29 (Bankr. S.D. Tex. 1992)), 'a trustee's avoiding powers in a hypothetical chapter 7 case may [ ] affect the analysis,' *id.* ¶ 1129.02." *Tenderloin Health,* 849 F.3d at 1237.

substantial asset.[27]  The Debtor has made it clear what he is trying to retain and why he is proposing to do so.  The how is less than clear.  The purpose of the Bankruptcy Code is to provide a debtor with a fresh start, not to preserve a debtor's extravagant non-exempt assets while paying his creditors a comparative pittance.  *See*, e.g., *In re Weber*, 209 B.R. 793, 800 (Bankr. D. Mass. 1997).  The Trustee will be allowed the opportunity to further probe into the ownership of JBW and whether and to what extent the Debtor's interest in it may be a recoverable asset in this case.

## CONCLUSION

For all of the above reasons, the Debtor's motion to convert his case from one under Chapter 7 to one under Chapter 11 so as to elect Subchapter V status is denied.  A separate Order will be entered contemporaneously herewith.

---

[27] The Court acknowledges the Debtor's contention that the Debtor's membership interest in the LLC, and not the real estate owned by the LLC, is property of the estate. Thus, what the Trustee may be able to realize for the estate is possibly a far different number than scheduled.